UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

MICHAEL BRUNO,

                        Plaintiff,

      -v.-                                       9:06-CV-0808
                                                          (DNH)(DEP)

LESTER WRIGHT, Associate Commissioner,
Chief Medical Officer; FREDDERICK GRABOW,
Camp Georgetown Correctional facility Physician;
and SUBBARAO RAMINENI, Mid-State
Correctional Facility Physician,

                              Defendants.

-------------------------------------------------------------------

APPEARANCES:                                OF COUNSEL:

MICHAEL BRUNO
Plaintiff, *pro se*
05-A-2947

HON. ANDREW M. CUOMO               HEATHER R. RUBINSTEIN, ESQ.
Office of the Attorney General
State of New York
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204

David N. Hurd
United States District Judge

## MEMORANDUM -DECISION and ORDER

**I. BACKGROUND.**

    **A. Allegations Contained in the Complaint.**

In the complaint, plaintiff names three defendants, Lester Wright ("Dr. Wright"), Fredderick Grabow ("Dr. Grabow"), and Subbarao Ramineni ("Dr. Ramineni"). (Dkt. No. 1). Dr. Wright is alleged to be the Chief Medical Officer for the New York State Department of Correctional Services ("DOCS"). Dr. Grabow is alleged to be a physician employed by

DOCS at Camp Georgetown; and Dr. Ramineni is alleged to be a physician employed by DOCS at Mid-State Correctional Facility ("Mid-State").

Plaintiff alleges that on November 16, 2003 he suffered chest pains at approximately four o'clock in the afternoon. Upon being informed, Dr. Grabow ordered the plaintiff to be taken from Camp Georgetown to Chenango Memorial Hospital ("CMH"), where he arrived at approximately 5:30 PM. Once at CMH, a Dr. Brereton admitted plaintiff for tests and observation. The tests conducted on November 17, and 18, 2003, resulted in a recommendation that plaintiff undergo cardiac catheterization. However, CMH did not perform that procedure. Plaintiff was advised that he would be returned to the infirmary at Mid-State until the procedure could be scheduled at another hospital. Plaintiff alleges he returned to Mid-state on November 19, 2003.[1]

At Mid-state plaintiff was kept in the infirmary under the care of Dr. Ramineni. Plaintiff inquired on a weekly basis when the procedure was going to be performed. He alleges that he received different responses including that the doctor was awaiting approvals from various sources, and scheduling delays that were caused by the December holidays. On January 6, 2004, plaintiff was transferred to St. Elizabeth Medical Center ("SEMC") and underwent a catheterization. As a result of the findings of the catheterization, plaintiff underwent an angioplasty and three stents were inserted. Approximately two hours later plaintiff suffered severe chest pain, and had an abnormal EKG. On January 7, 2004,

---

[1] According to Dr. Brereton's Discharge Summary, annexed to plaintiff's complaint, "[t]his situation was discussed with Dr. Grabow who is a physician for the Camp Georgetown Facility and with Dr. Ramineni who is the physician at the Mid-State Correctional Infirmary and we felt that the patient was in need of remaining in the infirmary, but did not need continued intensive observation pending cardiac catheterization." (Dkt. No. 1).

plaintiff alleges that a Dr. Gaffney informed him that he had suffered a myocardial infarction.[2]

Plaintiff was released from DOCS custody on January 14, 2004. While under the care of physicians in Sullivan County he was admitted to a hospital on December 7, 2004, due to chest pain. Plaintiff alleges that he underwent another cardiac catheterization which revealed that his right coronary artery was completely closed. Plaintiff alleges that the delay in treatment between November 19, 2003, and January 6, 2004, caused him to suffer additional damage to his heart; the subsequent myocardial infarction after his angioplasty; and the continuing health issues he experienced in December 2004.

Plaintiff alleges that Dr. Wright failed to establish appropriate policies for his subordinates to follow in cases of serious medical conditions. Further, plaintiff alleges that Dr. Wright was deliberately indifferent because he failed to arrange for immediate treatment of his condition.

Plaintiff further alleges that Dr. Grabow was deliberately indifferent to his medical needs because he had "the ultimate authority to arrange for plaintiff to receive his treatment." (Dkt. No. 1, page 10). Further, plaintiff alleges that Dr. Grabow was deliberately indifferent because he could have arranged for plaintiff to go directly to SEMC or another hospital for immediate treatment.

Plaintiff alleges that Dr. Ramineni was deliberately indifferent to his medical needs because he "failed to act to get plaintiff to the hospital so plaintiff could get the treatment that was ordered . . . ," and that "[a]s a result of the failure to get plaintiff the immediate

---

[2] The Transfer Summary annexed to plaintiff's complaint states the final diagnosis as "Angioplasty to the right coronary artery, non Q wave myocardial infarction, post-angioplasty." *See* Dkt. No. 1.

- 3 -

medical care that was warrented (*sic*) for this type of medical condition plaintiff was delayed treatment for 48 days." *Id.*, page 11.

### B. Procedural History.

Defendants answered the complaint on January 5, 2007. (Dkt. No. 13). On March 19, 2008, the defendants moved for summary judgment. (Dkt. No. 29). Plaintiff responded to the motion (Dkt. No. 32) and defendants filed a reply. (Dkt. No. 35). The motion was taken on submission without oral argument.

### C. Defendants' Motion for Summary Judgment.

In their motion for summary judgment defendants assert that neither defendant Dr. Wright nor Dr. Grabow had personal involvement in the underlying events sufficient to establish any claim against them. Further, defendants argue that plaintiff did not suffer from a serious medical condition or serious medical need; that plaintiff's complaint merely asserts a disagreement with defendants as to the proper treatment; that plaintiff's treatment was not delayed or otherwise inappropriate for his condition; and that all of the defendants are entitled to qualified immunity.

Plaintiff argues that his condition was serious, and that the delay of 48 days between the time he was transferred to Mid-State and the time he had the cardiac catheterization caused his condition to deteriorate, and to become more serious and irreparable. Plaintiff points to records that indicate that a catheterization will be scheduled within two days as an indicia of the urgency of his medical condition and of Dr. Ramineni's deliberate indifference. Plaintiff also argues that Dr. Wright's policy of requiring the cardiac consult unconstitutionally delayed his access to necessary health care services recommended by the CMH physician. Plaintiff argues that Dr. Grabow ignored CMH recommendations and

wrongfully transferred plaintiff's care to Dr. Ramineni instead of arranging for the immediate implementation of the CMH recommendations.

## II. **FACTS.**

Because the defendants have moved for summary judgment, the following material facts are portrayed in a light most favorable to plaintiff.

On November 16, 2003, plaintiff was sent to CMH, from Camp Georgetown, due to complaints of chest pain. (Dkt. No. 32). Defendants' Statement of Material Facts, ¶ 4. While at CMH, plaintiff underwent laboratory tests, a chest X-ray, an EKG, and an exercise Cardiolite stress test. (Dkt. No. 1, CMH Discharge Summary dated Nov. 19, 2003). The nuclear portion of the stress test showed "reversible inferior, posterior apical ischemia," and the discharge summary further noted:

> His nuclear portion, however, preliminary, shows reversible inferior, posterior apical ischemia. There may be a fixed defect at the apex, but it is less clear. There may be some partially fixed defect in the inferior wall. Subsequently, it was felt that the patient needed to proceed to cardiac catheterization. This situation was discussed with Dr. Grabow who is a physician for the Camp Georgetown Facility and with Dr. Ramineni who is the physician at the Mid-State Correctional Infirmary and we felt that the patient was in need of remaining in the infirmary, but did not need continued intensive observation pending cardiac catheterization. *Id.*

The Integrated Progress Notes from CMH state, in part: "A/P 1 Chest pain - evidence of ischemia See cardiolite Discussed in detail with patient and Dr. Grabow (Camp doctor) To transfer to prison infirmary and get cath next ~2 days."[3] (Dkt. No. 32, Exhibit A-1). These same Progress Notes state: "reviewed (with) Dr. Ramineni at Midstate correctional rept

---

[3] This is the interpretation derived from the reading of the handwritten progress notes as presented by plaintiff. Defendants did not take issue with plaintiff's interpretation of the notes, but rather, stated that: "I have carefully reviewed plaintiff's medical records and found no support for his claim that he was supposed to have the cardiac catheterization within two days of his discharge . . . . In fact, his medical records reveal no such recommendation . . ." (Dkt. No. 35, Reply Affid. of Dr. Ramineni, ¶ 5).

status. Pt. has no chest pains or unstable pattern and is stable for the planned transfer to the infirmary at Mid-state." *Id.* According to the Patient Transfer Orders, plaintiff was transferred from the care of Dr. Brereton at CMH to the care of Dr. Ramineni at Mid-State on November 19, 2003. (Dkt. No. 32, Exhibit A3-A4). The records also reveal that the physicians agreed the transfer to Mid-State was preferable because "there are . . . much larger facilities right nearby in case the patient has recurrence or re-aggravation of his symptoms or becomes unstable." (Dkt. No. 1, CMH Discharge Summary dated Nov. 19, 2003).

Dr. Ramineni admitted plaintiff to the infirmary at Mid-State on the afternoon of November 19, 2003, after plaintiff's discharge from CMH. Ramineni Affid., ¶ 7. Plaintiff's medical history included "atypical chest pain," and a "nuclear stress test showed that plaintiff had reversible ischemia (heart disease)." *Id.* Dr. Ramineni referred plaintiff for a cardiology consultation on November 20, 2003. *Id.*, Exhibit A-7. On December 1, 2003 DOCS physicians undertook their own consultation,[4] and determined that "plaintiff would need a cardiac catheterization, and he was told to abstain from smoking." *Id.*, ¶ 8. On December 7, 2003, plaintiff had an "incoming draft health screening" where the "orientation to medical unit procedures [were] completed." *Id.,* ¶ 9 and Ex. A-2. On December 11, 2003, a "chart audit was performed." *Id*. On December 16, 2003, a "Hepatitis C Chart Review was performed." *Id.* In this review it was "determined that plaintiff was not eligible

---

[4] A document entitled "Request for Report and Consultation" is attached to the Affidavit with no explanation from Dr. Ramineni. However, it states that Dr. Ramineni made a referral on November 20, 2003, and the "urgency of care" is listed as "soon." Ramineni Affid., Ex. A-7. The reason for the consultation is "Admitted to Chenango Mem. Hospital for aytpical chest pains and ruled out MI. Nuclear stress test positive for reversible ischemia. He also has PVD. Smoker and has family history. Need further evaluation and may need Cath. *Id.* It appears that the consulting doctor was Ashok Patel.

for treatment because his earliest release date was January 14, 2004. The decision was made to continue monitoring plaintiff if he didn't make parole." *Id.*

Dr. Ramineni states that "[o]n December 22, 2003, plaintiff was determined to have coronary artery disease . . . I decided to do a follow-up after plaintiff's cardiac catheterization." *Id.*¶ 11. Neither the Ramineni affidavit nor what is legible of the handwritten notes, appear to indicate that the catheterization was scheduled. On December 28, 2008, a nurse indicated in plaintiff's records that plaintiff is "being followed by HTN clinic,"[5] and that unspecified "labs" were scheduled for January 20, 2004. *Id.*, Ex. A-3. Plaintiff states, and defendants do not dispute, that the blood work ordered on December 28, 2003, was a liver function test relating to plaintiff's hepatitis C condition. (Dkt. No. 32, Plaintiff's Statement of Material Facts, ¶ 12). On December 30, 2003, plaintiff's pre-operative lab work was done. *Id.* On December 31, 2004, plaintiff's "parole medications" were ordered. *Id.* The next entry in plaintiff's medical records, as presented on the Ramineni Affidavit, is wholly illegible. *See* Ex. A-4, first entry.

Plaintiff was admitted to SEMC on January 6, 2004. (Dkt. No. 32, Ex. A-11). A cardiac catheterization was performed that noted impressions of "coronary artery disease with critical lesion noted in the non-dominant right coronary artery inducing chest pain, and noncritical left coronary artery disease." *Id.* The treatment plan is "urgent percutaneous transluminal coronary angioplasty and stenting." *Id.* The Transfer Summary from SEMC dated January 9, 2004, states that:

---

[5] The HTN clinic is never identified, nor are there any records from this clinic presented with this motion.

> a cardiac catheterization . . . was performed on 01/06/2004 by Dr. Gaffney showing significant 99% mid non-dominant right coronary artery and non-critical disease in the left coronary system. He did have dissection of the right coronary artery. He then went on to have angioplasty where he received three stents . . . He tolerated the procedure well. He was placed on Integrelin for 12 hours. Later that night he did develop some chest pain and was placed on Nitrol paste, and due to the small dominant right, there is a high risk of restenosis,[6] but not much intervention could be done due to the small vessel.

The final diagnosis on the Transfer Summary was: (1) angioplasty to the right coronary artery, non Q wave myocardial infarction, post-angioplasty; (2) dyslipidemia; and (3) hypertension. *Id.* Plaintiff suffered a minor heart attack after his angioplasty, and a repeat echocardiogram showed normal functioning. (Dkt. No. 29, Ramineni Affid. ¶ 16).

Plaintiff was discharged to Mid-State on January 9, 2004, and released to general population on January 12, 2004. (Dkt. No. 29, Ramineni Affid. Ex. A-4). Plaintiff was released from DOCS custody on January 14, 2004. (Dkt. No. 32, Deft. Statement Material Facts, Exhibit 1).

## III. DISCUSSION.

### A. Summary Judgment Standard.

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by

---

[6] Restenosis is the formation of new blockages at the site of the angioplasty or stent placement.

[Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion," and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of America., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Services., Ltd. Partnership*, 22 F.3d 1219, 1224

(2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

### B. Deliberate Indifference Claim.

To establish an unconstitutional denial of medical care, a plaintiff must establish that the defendant acted with deliberate indifference to serious medical needs. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The alleged deprivation must be sufficiently serious in objective terms and the defendant must know of and disregard an excessive risk to inmate health and safety. *Id.*

In order to satisfy this objective prong of the test, the plaintiff must demonstrate that his condition is one "of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d at 66; *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (citing *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998)). Such a serious medical need arises where "'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)); *Woods v. Goord,* 2002 WL 731691, *4 (S.D.N.Y. 2002).

In addition, the facts must demonstrate that the person or persons charged with providing plaintiff medical care knew of the serious medical need or condition and

intentionally disregarded it. *Chance*, 143 F.3d at 702. For prison officials, deliberate indifference requires more than negligence, but less than conduct taken for the specific purpose of causing harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The standard for deliberate indifference requires that the official know of and disregards an excessive risk to inmate health or safety. *Id.* at 837.

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Ross v. Kelly*, 784 F.Supp. 35, 44 (W.D.N.Y. 1992). An inmate does not enjoy the right to treatment of his choice, and it is well settled that mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment. *Id.* at 45 (*citing Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)); *Jackson v. Fair*, 846 F.2d 811, 817-18 (1st Cir. 1988); *see also Young-Flynn v. Wright*, 2007 WL 241332, *15 (S.D.N.Y. 2007). For example:

> [a] prisoner's disagreement with the form of treatment proscribed by medical personnel will not necessarily implicate the Eighth Amendment. Furthermore, disagreements between a prisoner and prison official over treatment decisions fall short of cruel and unusual punishment. Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim. These issues implicate medical judgements and, at worst, negligence amounting to medical malpractice . . .

*Lighthall v. Vadlamudi*, 2006 WL 721568, *10 (N.D.N.Y. 2006)(citations omitted). The *Lighthall* Court also noted that mere differences in professional judgment or opinions between doctors does not give rise to a deliberate indifference claim for inadequate medical care. *Id.*

Finally, because it appears that the timing of plaintiff's procedures is at issue, the Court notes that "a delay in treatment does not violate the constitution unless it involves an

- 11 -

act or failure to act that evinces a 'conscious disregard of substantial risk of serious harm.'" *Thomas v. Nassau County Correctional Center,* 288 F. Supp.2d 333, 339 (E.D.N.Y. 2003) *quoting Chance*, 143 F.3d at 703.

### 1. Dr. Fredderick Grabow

Plaintiff was under Dr. Grabow's care on November 16, 2003, when he reported that he was suffering chest pains. Dr. Grabow had plaintiff immediately transferred to a nearby hospital for assessment. Plaintiff asserts that Dr. Grabow was deliberately indifferent to plaintiff's serious medical needs because he ignored CMH recommendations, transferred plaintiff to the care of Dr. Ramineni, and did not arrange for plaintiff's immediate transfer to SEMC.

With respect to the symptoms of chest pains, relying on *Flemming v. Velardi*, 2003 U.S. Dist. LEXIS 13078 (S.D.N.Y. 2003), defendants assert that such a condition does not constitute a serious medical condition for purposes of establishing an Eighth Amendment claim. Such an argument is correct, to the extent that the factual underpinnings support such an assertion. However, after plaintiff was assessed at CMH, and certainly by the time plaintiff was released from the care of CMH, all parties were aware that plaintiff displayed evidence of heart disease. Diagnosed heart conditions or disease have been recognized as a serious medical condition. *See*, *Bennett v. Hunter*, 2006 WL 1174309 (N.D.N.Y. 2006); *Mejia v. Goord*, 2005 WL 2179422, *7 (N.D.N.Y. 2005)(The record in this case is strongly suggestive of plaintiff's suffering from a coronary condition which, though medically unspecified, could qualify as a serious medical need.)

Thus, Dr. Grabow's actions on November 16, 2003, are appropriately considered in light of the symptoms of chest pains reported to him by plaintiff. In response to the reported

symptoms, Dr. Grabow had plaintiff immediately transported to a nearby hospital for further assessment. Clearly, these actions do not indicate indifference to plaintiff's complaints and symptoms.

With respect to any further actions or omissions with plaintiff's care, the record is clear that plaintiff was never returned to the care of Dr. Grabow after November 16, 2003. While Dr. Grabow was consulted by the other physicians prior to plaintiff's transfer from CMH to Dr. Ramineni, there is no evidence that he was responsible for plaintiff's care. It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). It is evident that Dr. Grabow had no personal involvement in plaintiff's care after having plaintiff transported to CMH. Plaintiff has offered no evidence to the contrary. Accordingly, the motion for summary judgment will be granted with respect to Dr. Grabow.

### 2. Dr. Subbarao Ramineni

As discussed above, by the time plaintiff was transferred to the care of Dr. Ramineni on November 19, 2003, he had been evaluated at CMH, and a the testing suggested the presence of heart disease. Thus, for purposes of this motion, the plaintiff has established that he suffered from a serious medical condition while under Dr. Ramineni's care.

Accordingly, the issue is whether plaintiff has presented any evidence that Dr. Ramineni was deliberately indifferent to plaintiff's serious medical condition. The recommendation from the CMH physician was that plaintiff undergo a cardiac catheterization. The discharge summary report of laboratory work "indicated a lower risk situation." It appears that the physicians consulted and determined that plaintiff did not

require "intensive observation" while he waited for the catheterization procedure, but that he should be kept in the Mid-State infirmary. There is no dispute that plaintiff was housed in the infirmary from November 19, 2003, until January 6, 2004, when he was admitted to SEMC.

Plaintiff's sole basis for asserting that Dr. Ramineni was deliberately indifferent to his condition is the span of time between November 19, 2003, and the January admission to SEMC. Plaintiff asserts that the catheterization should have been performed within two days, in accordance with the discharge summary from CMH. Plaintiff further asserts that the cardiology consultation was unnecessary as Dr. Ramineni should have simply carried out the recommendation of Dr. Brereton.

Dr. Ramineni made a referral to the DOCS consulting cardiology specialists in Albany for approval of the procedure on November 20, 2003. (Dkt. No. 35, ¶ 6 and Exhibit A-7). The consultation occurred on December 1, 2003. *Id.*, Exhibit A-7. Dr. Ramineni stated that "when the procedure was approved, plaintiff was promptly scheduled with the contracted area cardiology specialists (C.N.Y. Cardiology) for their earliest available surgery date."[7] (Dkt. No. 35, ¶ 6). Plaintiff's pre-operative laboratory testing was performed on December 30, 2003. (Dkt. No. 29, ¶ 13). The catheterization was performed on January 6, 2004. *Id.*, Exhibit A-8.

Dr. Ramineni argues that "[t]here is simply no support for plaintiff's allegation that his procedure was delayed unduly, or that the six week delay between his CNH discharge and the performance of his heart catheterization and angioplasty caused him any additional or

---

[7] Neither party offered evidence as to the date when the approval for the procedure was issued by the specialists in Albany.

undue cardiac damage." (Dkt. No. 35, ¶ 6).  In fact, plaintiff has not presented any evidence that his care should have been treated as an emergency, or that he sustained any additional damage or injury as a result of the time span between plaintiff's discharge from CMH and his catheterization and angioplasty.  Nor has plaintiff presented any evidence that the delay was motivated by any animus towards plaintiff, or any disregard for a severe or rapidly deteriorating condition.  Further, plaintiff has not shown, or even alleged, that he sought or required any treatment in the Mid-State infirmary that was not provided.  Rather, he states "[p]laintiff was in the infirmary and given medication from the nurse when needed." (Dkt. No. 32, Bruno Affid., ¶ 13).

     Therefore, the plaintiff has failed to establish that Dr. Ramineni was deliberately indifferent to plaintiff's serious medical condition.  While plaintiff clearly would have preferred that the DOCS physicians and specialist simply adopt the recommendation of the CMH physician, they are not required to do so.  In essence, Dr. Ramineni sought a second opinion from a DOCS' specialist, which is not uncommon in modern medical practice.  Similarly, while plaintiff would have preferred that the time line from admission to Mid-State infirmary to his admission to SEMC was shorter, he has not presented any evidence that the time frame caused him any harm or additional damage.  Likewise, plaintiff has not shown that the time frame was the result of any indifference or inaction on the part of Dr. Ramineni.  Thus, at best, plaintiff has established that he disagrees with the course of treatment established by Dr. Ramineni.  However, that disagreement does not establish a violation of plaintiff's Eighth Amendment rights.

     Accordingly, the motion for summary judgment will be granted with respect to Dr. Ramineni.

### C. Supervisory Liability Claim.

Plaintiff asserts that Dr. Wright failed to establish policies that expedited emergency treatment ordered by medical supervisory personnel; was deliberately indifferent because he did not "arrange the immediate procedure that was required for plaintiff's condition"; and implemented a policy that required specialist consultations and surgical approval that was intended to unconstitutionally limit access to care.

The fact that an official holds a supervisory position is, standing alone, insufficient to establish that official's liability for the acts of his subordinates. *Hines v. City of Albany*, 542 F.Supp.2d 218, 230 (N.D.N.Y. 2008). However, there are several ways in which a supervisory official may be found personally liable for violating a plaintiff's constitutionally protected rights. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The supervisory official may be deemed to have personal involvement where he: (1) directly participated in the infraction; (2) failed to remedy the wrong even after learning of a violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) acted in a grossly negligent manner in managing subordinates who caused the unlawful condition or event; or (5) demonstrated deliberate indifference to the constitutional rights of the plaintiff by failing to act on information demonstrating that unconstitutional practices were taking place. *Colon,* 58 F.3d at 873; *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001).

With respect to plaintiff's assertion that Dr. Wright failed to arrange for plaintiff's procedure, he seems to suggest that Dr. Wright was personally involved in, or at least personally aware of, his treatment plan. However, plaintiff has offered no evidence that Dr. Wright was actually aware of plaintiff's condition, or the actions being taken by Dr.

Ramineni, while the events were occurring. Thus, plaintiff has not shown that Dr. Wright knew of and disregarded plaintiff's medical needs, or that he had any personal involvement in the decisions made with respect to plaintiff's medical care. *See Ozuno v.* Vadlamudi, 2006 WL 1977618 (N.D.N.Y. 2006).

With respect to the assertion that Dr. Wright failed to establish appropriate policies for expediting treatment, plaintiff merely offers conclusory allegations. Plaintiff fails to establish any notice to Dr. Wright that such a policy was needed, or that the lack of such a policy was causing some constitutional harm; he fails to establish that the lack of such policies impacted his medical care.

Plaintiff also alleges that Dr. Wright implemented a policy requiring specialist consultations, and in doing so, unconstitutionally limited access to health care. However, plaintiff has made no showing that any policy resulted in an unconstitutional denial of medical care to him or anyone else, or that any of the emergency provisions of the existing policies were applicable to him.[8] As discussed in detail above, the DOCS physicians sought a second opinion from a specialist prior to scheduling plaintiff for a cardiac catheterization. Plaintiff was maintained in the infirmary during this period of time, and no evidence has been presented that any harm came to him because of the delay occasioned by the specialist's consultation and the subsequent scheduling of the catheterization procedure in accordance with DOCS policy.

In sum, plaintiff has failed to establish that Dr. Wright: (1) directly participated in the alleged violations of his Eighth Amendment rights; (2) failed to remedy any alleged

---

[8] Plaintiff attached the DOCS policy on Health Care Referrals to his Motion.

constitutional violation after learning of those alleged violations; (3) created a policy, or permitted a policy to continue, that violated plaintiff's constitutional rights; (4) was grossly negligent in managing Dr. Grabow and Dr. Ramenini; or (5) was deliberately indifferent to plaintiff's needs by failing to act on information suggesting a constitutional violation was occurring.

Finally, given that plaintiff has not established that an underlying constitutional violation occurred, none of his claims for supervisory liability can stand. *See Linares v. Mahunik,* 2006 WL 2595200, *11 (N.D.N.Y. 2006) (holding that plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation"). For these reasons, defendants' motion with respect to Dr. Wright will be granted.

THEREFORE, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED; and

2. Plaintiff's complaint is DISMISSED in its entirety.

The Clerk is directed to file judgment accordingly and close the file.

IT IS SO ORDERED.

Dated: November 26, 2008
       Utica, New York.

_____
United States District Judge